JD Merrick, #99252
Arizona State Prison Complex – TUCSON
P.O. Box 24403          Unit RINCON INFIRMARY 9CI3
TUCSON                   AZ B5734

```
_____ FILED      ✓ LODGED
_____ RECEIVED  _____ COPY

      DEC 2 1 2015

  CLERK U S DISTRICT COURT
     DISTRICT OF ARIZONA
BY_____ DEPUTY
```

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

JD Merrick,                    )
                               )    NO. CIV 13-1544-PHX-PGR (JFM)
                Plaintiff,     )
                               )    PLAINTIFF'S MOTION FOR SUMMARY
vs.                            )    JUDGEMENT
                               )    _____
CHARLES L. RYAN, et al.,     , )    _____
                               )    _____
                Defendants.    )    _____
_____)

COMES NOW, Plaintiff, JD Merrick, a pro se litigant, and a layman of the law, hereby

motioning this honorable court FOR SUMMARY JUDGEMENT PURSUANT TO RULE 56(c) OF

the Fed.R.Civ.P. Plaintiff's motion is accompanied by the Plaintiff's SEPARATE STATEMENT OF

FACTS AND Exhibits.

This motion is supported by the memorandum of points and authorities and declaration

incorporated herein by reference.


## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BACKGROUND

This is A PRISONERS CIVIL RIGHTS LAWSUIT brought PURSUANT TO 42 U.S.C.

1983 by Plaintiff JD Merrick (hereafter "JD"), A FORTY-SEVEN (47) YEAR old INMATE who is

AT ALL TIMES herein under the custody and care of the Arizona Department of Corrections

("ADC"), AT the ASPC-Lewis - Barchey Unit, in Buckeye, Arizona.

1

JD's LAWSUIT COMMENSED ON 7/29/13. (Doc. 1). The Court SCREENED JD's complaint ON 3/31/14 AND dismissed it with LEAVE to AMEND. (Doc. 7-8). JD was GRANTED IN forma pauperis status. (Id.). On 3/31/14 JD filed a first amended complaint before he received the Court's screening order. (Doc 9). JD motioned to strike the first amended complaint on 4/14/13 and substitute it with a different first amended complaint. (Doc. 10). On 9/30/14 the Court ordered the Clerk to file JD's complaint as his "second amended complaint" and provide JD with service packs to serve the defendants. (Doc. 16). The Court issued a scheduling order on 1/06/15. (Doc. 38). On 3/12/15 JD motioned to FILE a third amended complaint, which the Court granted and the Clerk filed on 4/07/15. (Doc. 103-104).


## II.   SUMMARY JUDGEMENT STANDARD

A court must grant summary judgement "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the non-movant need not produce anything. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc., 210 F.3d 1099, 1102-03 (9th Cir 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existance of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v.

2

Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986); see Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).

When considering a summary judgement motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any. See Fed. R. Civ. P. 56(c). At summary judgement, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. Id. at 255. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgement. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). ("[C]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgement").

## III.   MEDICAL CARE STANDARD (COUNTS 1-4)

To succeed on a medical-care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." Jett, 439 F.3d at 1096 (citations omitted). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992). Examples that a prisoner has a serious medical need include "the existance of an injury that a reasonable

3

doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existance of chronic and substantial pain." McGuckin, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. Jett, 439 F.3d at 1096. The state of mind required for deliberate indifference is subjective recklessness; however, "the standard is 'less stringent in cases involving a prisoner's medical needs... because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" McGuckin, 974 F.2d at 1060. Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact, and a fact finder may conclude that a defendant knew of a substantial risk based on the fact that the risk was obvious. Farmer v. Brennan, 511 U.S. 825, 842 (1994).

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." Hallet v. Morgan, 296 F.3d 732, 744 (9th Cir 2002). Deliberate indifference may also be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988), or "by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003). And deliberate indifference may be shown by a purposeful act or failure to act to respond to a prisoner's pain or possible medical need. Jett, 439 F.3d at 1096.

Finally, even if deliberate indifference is shown, to support an Eighth Amend-

4

ment claim, the prisoner must demonstrate harm caused by the indifference. Jett, 439 F.3d at 1096; see Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmless.

## A.   PLAINTIFF'S SUMMARY OF FACTS

JD's complaint spans more than 3 years and consists of 560 SOF's. JD motioned this Court to extend the deadline to file a motion for summary judgement by 45 days but the Court granted only 21 days, requiring motions to be filed by 12/21/15.[1] (See Doc. 331 dated 11/18/15). The time alloted by the Court is insufficient for JD to complete his motion without taking a few short cuts. For the sake of time, economy and convenience JD incorporates his statement of facts herein as follows:

COUNT 1:  PSOF's 1-150.

COUNT 2:  PSOF's 151-558.

COUNT 3:  PSOF's 405, 407, 410-416, 419, 421-428, 431, 439, 441, 443-448, 475.

COUNT 4:  PSOF's 4, 46, 51, 137-141, 147-158, 185-187, 194, 196, 198, 200, 206-207, 210, 213-218, 224, 227-228, 239, 245-246, 250-251, 256-258, 261, 263, 271, 273, 275, 279, 283, 292, 299, 307-308, 311, 314, 317, 319-322, 324, 326, 329-333, 338, 356-357, 359a-361, 369-370, 376, 386, 393-395, 397, 407-408, 410-411, 419, 421-422, 424, 426-428, 431, 435-439, 444, 446-450, 452, 469-471, 473, 478-481, 486-487, 489-

490, 506, 509-510, 546, 548, 550, and 556.

B   GENERAL FACTS ABOUT PLAINTIFF'S MEDICAL CONDITIONS

At all times relevant herein JD is under the custody and care of the ADC at the ASPC-Lewis-Barchey Unit, in Buckeye, Arizona. (PSOF 1).

JD has a serious heart disorder known as sick sinus syndrome ("SSS") and Wolff-Parkinsons-White ("WPW"). (PSOF 2). JD's SSS and WPW cause a variety of arrhythmias due to his heart's dysfunctional natural conduction system. (Id.). Tachy-arrhythmias common to JD's disorders are: paroxysmal supraventricular tachy-cardia ("PSVT" and "SVT"), atrial fibrillation ("a-fib"), ventricular tachycardia ("v-tach"), and premature ventricular contractions ("PVCs"). (Id.). Symptoms associated with these arrhythmias include: chest pain ("CP"), confusion, near syncope, syncope, fatigue, dizziness, light headedness, shortness of breath ("SOB"), palpitations, anxiety, fear, and insomnia. (Id.). In 2001 JD received a permanent implanted pacemaker to resolve bradyarrhythmias. (Id.). JD's tachyarrhythmias are controlled with medications. (Id.). JD also has a history of congestive heart failure ("CHF"). (PSOF 6).

On or about February 26, 2002, JD was diagnosed with sleep apnea, which he uses a CPAP to treat. (PSOF 3).

Since circa 2009 JD has a history of severe hypertension with alternating hypotension. (PSOF 4). JD's hypertension can exceed 200/100 and his hypotension drops below 40 (diastolic). (Id.). Untreated hypertension can damage organs and tissues. (Id.). According to JD's doctors his blood pressure ("BP") is difficult to control. (Id.).

6

JD requires multiple medications to lower his high BP. (Id.). SINCE JANUARY 25, 2012, JD's CARDIOLOGISTS ORDER HIM TO MONITOR HIS BP DAILY AND STAGGER HIS MEDICATIONS THROUGHOUT THE DAY TO TRY AND AVOID LOW BP. (Id.).

On or about December 6, 2010, JD was diagnosed with hypothyroidism, which he takes synthroid ("Levothyroxine") to treat. (PSOF 5).

JD also receives medications to treat hyperlipidemia, CHF, myalgia, myositis, and acid reflux/gastritis. (PSOF 6).

Propafenone (aka Rhythmol) is a medication used to treat JD's tachyarrhythmias. (PSOF 136). The therapeutic effect of Propafenone is 2 to 10 hours half-life after the last dose is taken. (Id.). A patient who suddenly stops taking Propafenone can see an increase in arrhythmias. (Id.). Lisinopril is a medication used to treat JD's hypertension. (PSOF 137). Lisinopril has a half-life of 12.6 hours after it is last taken. (Id.). A patient who stops taking BP medication will see his/her BP increase. (Id.). Untreated hypertension can cause an exacerbation of tachyarrhythmias and stroke. (Id.). Hydrochlorothiazide (aka: HCTZ) is a medication used to treat JD's hypertension, which has a 5-15 hour half-life before the therapeutic effect wears off. (PSOF 138). A patient who stops taking BP medication would see their BP increase. (Id.). Untreated hypertension can cause an exacerbation of tachyarrhythmias and stroke. (Id.). Atenolol is a medication used to treat JD's hypertension and to slow down his heart rate and resolve chest pain.[1] (PSOF 139). The half-life of Atenolol is 6-7 hours before it begins to lose its therapeutic effect. (Id.). Patients who stop taking Atenolol

---

1. The BP medications listed herein are prescribed concomitantly; they're not effective in JD's case unless he takes them together as prescribed. (Infra).

7

suddenly would see an increase in their BP. (Id.) **Diltiazem** is a medication used to treat JD's tachyarrhythmias (A-fib and SVTs) and it lowers BP. (PSOF 140). Diltiazem has a half-life of 3-5 hours before the therapeutic effect begins to wear off. (Id.). Untreated hypertension and tachyarrhythmia can lead to JD suffering stroke, heart attack, loss of consciousness and death. (Id.). **Levothyroxine** is a medication used to treat JD's hypothyroidism. (PSOF 142). It has a half-life of 3-5 hours. (Id.) Left untreated JD's hypothyroidism causes him to feel fatigued/lethargic, foggy/confused, constipated, and sensitive to hot and cold temperatures. (Id.). **Pravastatin/Simvastatin** is a medication used to treat JD's hyperlipidemia and reduce his risk of a heart attack and stroke. (PSOF 143). **Omeprazole** and **Ranitidine** are medications used to treat JD's gastritis and acid reflux disease. (PSOF 144). If JD doesn't receive either medication he will experience substantial pain and burning from his stomach to his mouth, and under some circumstances his stomach will bleed. (Id.). **Multaq** (aka: Dronedarone) is a medication used to treat JD's heart and tachyarrhythmias. (PSOF 145). JD's arrhythmias can suddenly return if he should suddenly stop taking Multaq. (Id.). Lastly, **Pradaxa** is a blood thinner medication JD takes to reduce his risk of blood clots, stroke, and death. (PSOF 146).

According to Defendant Corizon, an inmate's FAILURE TO TAKE Ordered medications may have a negative effect on the immediate or long term Health and well-being of the patient." (PSOF 147)

The ADC's definition of a **Serious injury** is " a medical condition involving an inmate that, if not treated immediately, would result in serious medical complications, loss of life, or permanent impairment to bodily functions, e.g., uncontrolled bleeding, **loss of consciousness**, poisoning, severe **shortness of breath**, severe **chest pain**, paralysis, suspected overdose of medication, and apparent stroke. (PSOF 150)

## IV.   COUNT ONE

Named as defendants in count one is ADC Director Charles Ryan, ADC's Health Services Contract Monitoring Bureau's (HSCMB) Director Richard Pratt, Wexford Health Services ("Wexford"), Wexford Arizona Director of Operations Karen Mullenix, Wexford Pharmacy Director Dr. Denise Mervis, and the ASPC-Lewis Wexford Facility Health Administrator ("FHA").

### A.   DEFENDANTS CHARLES RYAN AND RICHARD PRATT

Given the limited time JD has to complete this motion, coupled with the unique nature of count 1 and the relationship between Defendants Ryan and Pratt, JD will address their liability together. Again, JD prays for the Court's leniency as to the form of his motion.

At all times herein Defendants Ryan and Pratt acted under color of state law. (Def. Answer, Doc. 110). JD incorporates ¶¶ 1–129 and 134–150 herein by reference — all of which establishes these defendants' liability.

Under 42 U.S.C. 1983, supervisory officials are not liable for actions of subordinates on any theory of **vicarious** liability. Hansen v. Black, 885 F.2d 642, 645–46 (9th Cir. 1989). However, "[a] supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Snow v. McDaniel, 681 F.3d 978, 989 (9th Cir. 2012). Further, "A supervisor may be liable if the supervisor knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

9

Pursuant to Arizona Revised Statute ("A.R.S.") 31-201.01 (D), Director Ryan "**shall** provide medical and health services for the prisoners. The Director may contract for professional services to **ASSIST** the Director in carrying out this responsibility on behalf of the state." (Id.) (Emphasis Added). Also, the "Director may delegate to **appropriate**[2] personnel the administrative functions, powers or duties that the director believes can be **competently**, **efficiently** and **properly** performed." See A.R.S. 41-1604 (B)(2)(d), (Emphasis Added).

In 2009 the Arizona Legislature passed HB 2154 which required the ADC to privatize all correctional health services. Also cp. A.R.S. 41-1608. The Legislature did not free the ADC Director from his responsibility to ensure that whoever was picked to provide health care did so in a constitutional standard. The Procurement Services Bureau ("PSB") who arranges contract health services is under the authority of Defendant Ryan. (PSOF 8) Ultimately the PSB awarded the contract to Wexford after considering other submissions by competitors. (PSOF 21) On 7/1/12, the begin date of Wexford, Director Ryan appointed Defendant Pratt as the Director of the newly formed HSCMB. (PSOF 11). Pursuant to ADC Department Order ("D.O.") 1100 (Inmate Access to Health Care) Pratt "shall hold the Contractor providing Health Services accountable to ensure all inmates are provided access to scheduled and emergency (as needed) health care." (PSOF 12). The HSCMB Director is to ensure that the contractor complies with **all** aspects of the contract, and if they don't, then he is authorized to impose sanctions and cure notices. (PSOF 13). Pratt may

---

2. According to Webster's New World Dictionary the word "appropriate" means "suitable". The state wants the Director to be certain that he chooses a qualified person who will com-"petently, efficiently and properly" carry out the duties the Director delegates. As is seen infra Defendant Pratt is both unqualified and incompetent as the HSCMB Director.

impose a $1000 to $10,000 monetary sanction for an act of deliberate indifference that disregards a known and excessive risk to an inmates health and or failing to provide comprehensive health care coverage 24 hours a day, 7 days a week. (PSOF PSOF 14).

Pursuant to the Arizona Department of Administration the HSCMB Director was at all times herein required to have "a current and unrestricted license to practice medicine in Arizona. (PSOF 17). Pratt was not licensed. In fact, Pratt had no prior experience in supervising the privitization of an agency as large as the ADC. (PSOF 53). Pratt wasn't even aware of who was the Director of Operations for Wexford and who was responsible for the transition in a manner that ensured the continuity of healthcare to the inmates. (Id.). JD asked Mr. Pratt under oath if he and Wexford rehearsed the ADC handover to Wexford and he said, "NO." (Id.). That'll soon be obvious to the Court. JD's point is that Ryan never vetted Pratt before appointing him the head of the HSCMB. (PSOF 19). Director Ryan had no reason to "believe" that Pratt could "competenly, efficiently and properly" perform the duties of the HSCMB's Director that is required by A.R.S. 41-1604 (B) (2)(d). Defendant Ryan goes on to say that he does not have a duty to supervise Mr. Pratt's job performance. (PSOF 10).

On 4/25/12 — before the start of Wexford — JD's cardiologist Dr. H. Naik concluded that JD's heart condition was "STABLE!" (PSOF 47). Two weeks before Wexford's start JD sent two HNRs to ADC health services requesting

2. PSOF 18.

11

renewals of his meds Propafenone, Lisinopril, Lovastatin, aspirin, and Atenolol. (PSOF 48-49). Two days later on 6/14/12 LPN Dudley wrote back "Already ordered by provider." (PSOF 49).

Prior to Wexford's start on 7/1/12 the ADC dispensed inmates' medications from pharmacies located on prison grounds. (PSOF 23) It took only 1-2 days for inmates to receive them (Id.) When the ADC contracted with Wexford both "mutually agreed" to operate a fax and fill system from a pharmacy located in Pennsylvania that would ship medications to inmates via ground courier Monday - Friday (no weekends or holidays)[3]. (PSOF 24-25, 34-35). Defendants Ryan and Pratt were aware of these provisions at all times herein. (PSOF 123 and 126).

Before the ADC awarded the contract to Wexford they received bids and proposals from other industry competitors. On January 3, 2012 Corizon Health, Inc. cautioned the ADC not to close all of their on-site prison pharmies before the privitization transition and keep some of their pharmacies up and running for 120 days after the start of the contract in order to avoid "inherent problems" associated with converting to a fax and fill system, issues that are significant. (PSOF 134). The concern was with not being able to fill all of the prescriptions carried over from the ADC to the new pharmacy. Defendants Ryan and Pratt disregarded the industry warnings and the ADC ceased the filling of prescriptions prior to the inception of its contract with Wexford, ending all onsite Pharmacy operations. (PSOF 27). This is another example of Defendant Pratt's qualifications as will be

3. Though Wexford accepted responsibility for Pharmacy services (PSOF 22 & 28) they were not qualified to operate a Pharmacy Program (PSOF 26)

12

seen infra. To make matters worse **all** off count one defendants were aware that there was a medication shortage PRIOR to the Wexford start date. (PSOF 54). On top of that the ADC's electronic pharmacy records (prescription data) did not properly transfer over to the Wexford/Diamond system. (PSOF 55). These issues and still more to come, resulted in thousands of inmates who did not receive their medications on time. (Id.), including JD.

Defendants Ryan and Pratt had no policies/safeguards in place to ensure that inmates would be protected. Why? Because they simply did not care. At all times herein it is the policy and position of both Defendants Ryan and Pratt that once the ADC health services division was given to a contractor neither of them were responsible to ensure that the contractor competently carried out their contractual duties. (PSOF 9 and 20). Pratt believes that he can only monitor the contractor, that he doesn't have the authority to make the contractor compliant. (PSOF 20 and 109) (Also see infra). This obviously runs afoul of the U.S. District Court's ruling in November 2012. JD asks the Court to take Judicial Notice of Parsons, et al. v. Ryan, et. al., CIV 12-0601-PHX-DKW at Doc. 235. The Court stated, "Ryan has a continuing duty to ensure that those to whom he delegated functions or duties performed those duties appropriately" and that delegation "does not absolve Ryan of his obligation to ensure the provision of medical care is constitutionally adequate". (PSOF 16).

On June 16, 2012, the ADC and Wexford posted a joint memo in JD's dorm that addressed the upcoming medication changes. (PSOF 50). In summary the memo stated: "Effective 7/1/2012, Keep on Person (KOP) medications will be ordered through Wexford Health Services. You will continue to utilize the current Health Needs Requests (HNR) form to request

refills... Please allow a minimum of 7 business days (not including weekends)... For July, August, and September only, your medications will automatically be refilled." (Id.)

On June 29, 2012, JD's cardiologist ordered JD to "continue Rhythmol (aka Propafenone). On beta blocker (Atenolol) to prevent possibility of atrial flutter with rapid 1:1 AV conduction." (PSOF 51). JD was also ordered to closely monitor his BP. (Id.)

On July 1, 2012 Wexford assumed the responsibility for ADC inmate health care. (PSOF 52). Defendant Pratt allegedly supervised the handover. (PSOF 53). From day one inmates stopped receiving their medications. Wexford's pharmacy (Diamond) shipped boxes of medications to the wrong prisons. (PSOF 56). Wexford staff incorrectly entered prescription orders into the pharmacy database. (PSOF 57). Medication labels had the wrong information on them. (PSOF 58 - 60)..

On July 9 JD ran out of his heart medication Propafenone, Lisin-opril[4] and aspirin. (PSOF 61). Patients who suddenly stop taking these medications can see an exacerbation of their condition (i.e. arrhythmias and hypertension). (PSOF 62-64). On July 10 JD began submitting HNRs, informal complaints, and talking to Wexford staff about his medication. (PSOF 65-67). In an email by Pharmacy Director Defendant Dr. Mervis on July 9-10 she commented that the ADC was aware of the interruptions in medications. (PSOF 68). Of course there's no evidence that the ADC (Ryan and Pratt) did anything to

---

4. Lisinopril also treats hypertension. (PSOF 137).

see that inmates receive their medications. (Also cp. PSOF 69).

On July 11-13 JD became symptomatic without his medications — his tachyarrhythmias returned. (PSOF 70). JD was SOB, he had chest pain, he was dizzy, hypertensive, and he had visual problems. (Id.). He called his parents at home and asked them to help him. (Id.) On July 12th JD's mother (Barbara Prendergast) phoned Defendants Ryan and Pratt and advised them about JD situation and they told her to call Wexford. (PSOF 71).

On July 13, JD managed to get Dr. Echvarria (of Wexford) to order him his Propafenone STAT for 5 days. (PSOF 72). She also submitted an order for Propafenone x 180 days but the pharmacy did not fill it. (Id.). On July 18, JD ran out of his STAT meds and quickly his tachyarrhythmias, chest pain, SOB, etc. returned. (PSOF 73). Again JD's mother phoned Wexford officials. (Id.). JD had already begun to file complaints and HNRs in the week prior (PSOF 65-67), so he next filed an emergency complaint seeking help and asking for his medication. (PSOF 75). On July 19, JD received some refills of his medications, but still not the ones he needed. (PSOF 79). Another attempt by another doctor was made to order JD's Propafenone on the 19th. (Id.). Under the ADC contract with Wexford if a medication was ordered on a Thursday the inmate had to wait until the following Monday or Tuesday to receive it. (PSOF 81). Defendant Pratt was aware of this delay. (Id.).

On July 20th JD submitted another complaint pleading for help (PSOF 83), as well as a Formal emergency grievance. (PSOF 84). The HSCMB was aware of JD's emergency grievance. (PSOF 86-87, 89).

On August 3, 2012, JD finally received his Propafenone, Lisinopril, and aspirin. (PSOF 92-93). Wexford blamed the ADC for some inmates not receiving their medications because the ADC ceased filling their prescriptions prior to the inception of the Wexford contract. (PSOF 96) Furthermore, Wexford officials claim that they had discussions with Defendant Pratt about the medication administration procedures and the need for additional training for nurses. (PSOF 97).

Fearing more interruptions in his medications JD submitted an appeal in grievance no. 125-077-12 on 8/7/12 (PSOF 98), which Defendant Pratt reviewed. (PSOF 107). Then on August 20th JD's Atenolol was permitted to expire despite his HNRs asking for renewal. (PSOF 99). On August 24 JD's provider reordered the Atenolol but the pharmacy did not dispense it. (PSOF 100). The provider tried again on August 27 and this time the pharmacy dispensed it **18 days later.** (PSOF 101)

On September 5, 8, and 18, JD submitted HNRs to Wexford asking for medication renewals and refills. (PSOFs 103-106).

Finally, on September 21, 2012, the ADC, along with Defendants, served Wexford with a written cure notice demanding Wexford to cure deficiencies in their health care delivery system — to include medication problems. (PSOF 106). Defendant Pratt and the PSB acknowledged that the problems were "state-wide," and included inadequate staffing levels, insufficient training, and incorrect, incomplete, and inconsistent medication administration or documentation of care provided. (Id.) The ADC acknowledged that they knew that there were thousands of inmates who weren't receiving their medications and rather than assist Wexford to ensure that inmates received their meds on

16

time the ADC defendants simply sat idly by wagging their fingers. At the end of the cure notice the ADC stated: "The ADC expects Wexford to effect sustained, systemic operational improvements in the management and delivery of health care services to ADC inmates. ADC is not contractually obligated to deploy its resources to manage Wexford's day-to-day, as well as crisis operations." (Id. 106 at P. 30). When prison officials simply sit idly by and do nothing knowing that inmates are at risk and suffering they violate the inmate's civil rights. See Alexander v. Perrill, 916 F.2d 1392, 1395 (9th Cir. 1990). The ADC's failure to correct constitutional violations supports a finding that there was a policy or custom that led to the violation of the inmate's rights. See Gomez v. Vernon, 255 F.3d 1118, 1127 (9th Cir. 2001).

On October 16, 2012, the ADC Director's Office and Defendant Pratt upheld JD's grievance appeal in case no. 125-077-12. (PSOF 107). They acknowledged JD's complaints and promised him that "new processes have been implemented to avoid the recurrence of [the] problem." (Id.). The Director added that "staff have also been advised to ensure medications are provided in a timely manner to prevent delay in care and potential negative outcomes." (Id.).

Defendants Ryan and Pratt were aware of JD's serious health problems and his need for his medications. (PSOF 71 and 108). However, two days after they just promised JD he would not have anymore problems with his medications JD ran out of his Levothyroxine, Omeprazole, Atenolol, Loratadine, and hydrochlorothiazide. (PSOF 112). Just the day before ADC officials knew that reviews "indicate that many patients are still going without Chronic Care medications." (PSOF 111). By October 19th JD was symptomatic again without his meds. (PSOF 113).

17

Five days later, on October 23, doctors were ordering JD's medications. (PSOF 114). However, due to improperly trained Wexford staff the prescriptions were incorrectly entered into their pharmacy system. The number "0" was entered for the quantity of pills that were to be dispensed. (Cf. PSOF 57 with 114-115).

In the days following JD's condition worsened and JD was eventually sent out to be evaluated by his cardiologist as he continued to experience interruptions in his medications. (PSOF 116-117, 119). Cardiologist Dr. Bhattacharya quickly concluded that "GIVEN FAILURE OF ANTI-ARRHYTHMIA DRUG THERAPY" and objective evidence of "multiple mode switches on the patients pacemaker and [his] symptoms [indicating] he is having episodes of symptomatic atrial fibrillation with rapid ventricular rates above 180 beats per minute" that to stop it JD would need to undergo heart surgery. (PSOF 119). On November 20, 2012 an "URGENT" referral for JD's surgery was submitted. (PSOF 120). On December 13 JD's surgery took place. (PSOF 121). A large area of JD's heart had to be modified to try and stop his arrhythmias. (Id.).

Wexford officials would admit that "moving from onsite pharmacies to a fax and fill system would create enormous gaps in the provision of pharmacy services" and that had the ADC accurately communicated to Wexford the extent of the challenge ahead of them they would have delayed the change over to a fax and fill system until appropriate staffing levels were achieved and clinical staff were trained and proven competent. (PSOF 118).

In short, it was the decisions of Defendants Ryan and Pratt

18

to enter into a contract and or acquiesce in a policy to end all on-site pharmacy operations for a fax and fill system that could not meet the needs of the ADC inmates that contributed to JD's suffering and injuries. What's more, their policy to merely monitor and rely on Wexford to provide JD with his medications without making sure he got his meds on time also contributed to his injuries. (PSOF 109). These are all factors responsible for violating JD's civil rights under the Eighth Amendment. Not one time did the ADC take any punitive action against Wexford for their many failures to meet their contractual obligations during the entire life on their contract. (PSOF 125).

JD's evidence establishes that Defendants Ryan and Pratt were deliberately indifferent to JD's serious medical condition in violation of his Eighth Amendment Constitutional Rights which warrants the granting of summary judgement on JD's behalf. For cases similar to this case, see: King v. Busby, 162 Fed.Appx. 669, 2006 WL 122424 (C.A.8 2006); Mastroianni v. Reilly, 602 F.Supp. 2d 425 (D.C.N.Y. 2009). Lewis v. Mitchell, 416 F.Supp.2d 935, 945 (S.D. Cal. 2005). (a person may be liable under 1983 if he omits to perform an act which he is statutorily required to do).

B.   DEFENDANTS KAREN MULLENIX, DR. MERVIS, AND WEXFORD

Due to limited time JD has remaining to complete this motion he respectfully incorporates PSOF 21 - 150 herein by reference for the Court's consideration.

Defendant Wexford first and foremost was awarded the contract to provide health care services to ADC inmates effective July 1, 2012. (PSOF 21) Wexford was tasked with providing inmates with medications and overseeing the pharmacy subcon-

tractor to make sure that they provided medications on a timely basis. (PSOF 22). Wexford guaranteed the ADC they would ensure a seamless transition for medication delivery services. (PSOF 28). They promised to train all necessary staff on all aspects of medication receiving, distribution, and tracking. (Id.). Training included orientation regarding pharmacy operations at the ADC facilities, the proper use of forms, policies and procedures. (Id.)

Wexford hired Defendant Mullenix as their Director of Operations under the ADC contract. (PSOF 29). She was responsible for overseeing the healthcare rendered to inmates — but she had no prior experience in corrections and no medical training. (PSOF 30). Her entire work history was in pharmaceutical and insurance sales and marketing. (Id.).

Wexford hired Defendant Dr. Mervis as their Director of Pharmacy Services. (PSOF 31). She too was responsible for overseeing the healthcare rendered to inmates. (Id.) Her duties included thoroughly training all appropriate onsite staff on ordering procedures, storage of pharmaceuticals, accounting procedures, pharmaceutical distribution, management and inventory, pharmaceutical troubleshooting and enforcement of other services in accordance to the agreed upon Pharmacy Policy and Procedures Manual, and the supervising of staff. (Id.)

According to Dr. Mervis "Wexford was not licensed as a pharmacy and did not have the proper qualifications to operate an onsite pharmacy" (PSOF 26), so along with the ADC they mutually agreed on a fax and fill system that relied on Diamond Pharmacy Services on the East Coast to ship medications to ADC inmates Monday–Friday — inmates did not receive medications on weekends or holidays. (PSOF 34–41). Wexford was required to employ sufficient staffing

And utilize appropriate resources to achieve contractual compliance. (PSOF 42).

As demonstrated already (supra) JD experienced a number of prolong interruptions in his life-saving medications that resulted in him becoming seriously ill and needing to undergo heart surgery in December 2012. (PSOFs 47-51, 61-95, 98-105, 107, 110, 112-117, 119-121).

Suits against private corporations that provide medical care are treated like suits against municipalities: the prisoner must show that the injury was caused by a policy of the corporation. Johnson v. Karnes, 398 F.3d 868, 877 (6th Cir. 2005). Or routine failure to follow policy can be a "custom" supporting liability. Redman v. County of San Diego, 942 F.2d 1435, 1445 (9th Cir. 1991). On the other hand, an absense of a policy could constitute deliberate indifference too. Conn v. City of Reno, 572 F.3d 1047, 1064 (9th Cir. 2009).

JD's evidence demonstrates a long list of failures and deliberate decisions by Wexford policymakers and their top officials that impacted JD and several thousand other ADC inmates throughout the state. For instance...

i. Wexford chose not to obtain the appropriate licencing and permits to maintain a pharmacy program either on prison grounds or within the state of Arizona. (PSOF 26) Instead they chose to subcontract with a pharmacy on the other side of the country (Pennsylvania) that shipped meds to ADC inmates via ground courier only, Monday-Friday and not on holidays (PSOFs 25, 34-35), which created gaps and lapses in prisoners' drug therapies (like JD) whos providers ordered his medications on a Thursday or Friday and had to wait until the following week to get their meds. Such a system is unconstitutional when it

21

results in ID's unnecessary pain and suffering. E.g. see Hoptowit v. Ray, 682 F 2d 1237, 1252 (Inadequate medication distribution system that results in denial or delay of medications). Also cp. (PSOF 81)

ii    During, and prior to, the transition to Wexford on July 1, 2012, the Defendants all knew that there was a medication supply shortage and that inmates would not receive their medications on time. (PSOF 54). The defendants also knew that the ADC's inmates' electronic pharmacy records was not properly transmitted to the contractor's system that added to the interruptions in inmates' medications around the state. (PSOF 55). Despite these substantial issues Wexford chose to go forward with the handover without placing any safeguards in place. E.g., No alternative pharmacy (a backup) was used. No back up or alternative records system was in place. What policies were in place to ensure the continuity of ID's care clearly was not followed (i.e., troubleshooting, early refills and re-newals, etc.). (PSOF 36, 40-41, 43).

iii    Within the first two weeks of the transition the pharmacy shipped boxes of medications intended for ADC inmates to the wrong prisons. (PSOF 56). Wexford staff incorrectly processed inmates' prescription orders that effected ID as well, which clearly showed the staff's lack of training. (PSOF 57, 106 at p. 31, 114-115). The pharmacy affixed the wrong labels to prisoners' medications making them unusable. (PSOF 58-59).

iv.    Defendants Mervis and Mullenix knew about all of the foregoing problems. On July 3, 2012, Dr. Mervis emailed Director Mullenix about the pharmacy data that did not transfer accurately, and about the wrong labels that rendered inmates medications unusable. (PSOF 59).

On July 6th Mervis emailed Mullenix complaining about working late hours to try and prevent ongoing late medication deliveries. (PSOF 60). Dr. Mervis expressed her doubts that the pharmacy selected by Wexford was capable of pulling their own weight. (PSOF 60). On July 9-10 Dr. Mervis made the following admission in another email sent to Diamond Pharmacy: "Wexford and the State of Arizona are not only baffled by these issues and Diamond's response — but have also exhausted our tolerance." (PSOF 68). Despite these conclusions, not one of the count one defendants pushed to change pharmacies. They continued as business as usual. Even Defendant Mullenix (Director of Operations), as early as July 10th stated that she had serious doubts that Diamond was the "right partner in the AZ contract." (PSOF 69). Also see (PSOF 129 - Fax and Fill system results in delayed treatments).

Months later as the contract between the ADC and Wexford imploded, Mullenix communicated to Defendant Pratt that their staff needed more training. (PSOF 97). The ADC agreed and complained that Wexford lacked sufficient staffing levels. (PSOF 106). In November 2012 Defendants Wexford and Mullenix proceeded to turn the blame for Wexford's failures on the ADC in a obvious attempt to mitigate future liability issues. Mullenix published a PowerPoint presentation that in part read: "The ADC never disclosed — either in person or in the solicitation materials — that due to the unusual, non-standard structure of its pharmacy program, moving from onsite pharmacies to a fax and fill system would create enormous gaps in the provision of pharmacy services." (PSOF 118). Mullenix added: "If the ADC had accurately communicated to Wexford Health the extent of pharmacy staff's role in supporting the overall inmate health care system, we would have delayed the change over to a fax and fill system until — Appropriate staffing levels were achieved; and, — Clinical staff were trained and proven competent." (Id.)

The ADC and Wexford contract ended on March 3, 2012. (PSOF 135)

23

In short, the record herein demonstrates that JD suffered pain and significant physical injuries requiring heart surgery due to the defendants' deliberate indifference. It was their omissions that was the moving force behind JD's injuries. It was their policies and practices that now warrants this Court to grant JD's motion for summary judgement. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (a supervisor may be liable if the supervisor knew of the violations and failed to act to prevent them). Jackson v. Fauver, 334 F.Supp.2d 706, 739 (D.N.J. 2004) (a private contractor's failure to provide vital medications is actionable).

C.   DEFENDANT FHA SUMI ERNO

JD respectfully incorporates PSOF's 1-6, 32-33, 42, 47-52, 61-67, 70-80, 82-95, 98-99, herein for the Court's consideration.

Defendant Sumi Erno at all times between July 1 and September 8, 2012, was the Wexford FHA at the ASPC-Lewis. (PSOF 32). Her duties included insuring that ADC inmates received medically appropriate healthcare. (Id.). Specifically, FHA Erno was responsible for supervising department heads in the operation of pharmacy, along with providing training to ASPC-Lewis staff in the area of pharmacy services; ensure that unreasonable barriers to health services are avoided or eliminated; **ensure the timely and efficient response to all healthcare needs**; she is to approve staffing levels at the facility; And, pursuant to ADC Inmate Grievance policy she is to investigate, attempt to resolve and respond to medical grievances submitted by inmates at ASPC-Lewis. (Id.). JD also asks this Court to take judicial notice of ADC D.O. 1100 ("Inmate Access to Healthcare") at 1101.07 @ 1.2 and 1.2.2, which states that the FHA/Site Manager shall "ensure special arrangements are made for treatment or delivery of medications immediately after being notified of such a need by the supervising physician or

24

Director of Nursing."

When JD's medications first ran out on July 9, 2012 (PSOF 61-64), he quickly began to submit HNRs, informal complaints, and speak to his units health staff about needing his medications right away. (PSOF 65-67). By July 11-13 JD became fully symptomatic without his meds (i.e., tachyarrhythmias, SOB, chest pain, dizziness, hypertensive, and visual problems. (PSOF 70). JD's pleas for help fell on deaf ears so he phoned his mother and asked her for help on July 12th. (PSOF 71). JD's mom phoned Defendant Erno and told her JD was without his meds and sick. (Id.). JD's mom asked Erno to help JD.

Over the next few days JD continued to seek help. He managed to get a 5 day supply of his Propafenone on July 13 through Dr. Echvarria — who also ordered Propafenone for 180 days but the pharmacy did not fill it — but the 5 day STAT order ran out on July 18. (PSOF 72-73). On July 18th JD's deputy warden Kimberly Currier alerted FHA Erno to JD's problem along with a list of other inmates who did not have their meds. (PSOF 74). JD also submitted informal grievances as an EMERGENCY, which per policy Defendant Erno was required to immediately address but did not. (PSOF 75-77). The grievance policy at D.O. 802 states that the FHA is the final authority whether or not an inmate has a medical emergency. (PSOF 78). However, according to Wexfords own criteria FHA Erno was not qualified to be an FHA. Erno had no medical education or training and no college degrees. (PSOF 33, 78). In order for Erno to determine if JD's issue was a medical emergency she would need to be medically qualified. E.g. see Peralta v. Dillard, 744 F. 3d 1076, 1087 (9th Cir. 2014) (unqualified grievance staff).

Nonetheless, FHA Erno did not respond to JD's emergency informal.

25

JD submitted another HNR on July 19th seeking his missing medications. (PSOF 79). JD continued to report his symptoms to Wexford staff, including Dr. Bell on the 19th.[5] (PSOF 80). Dr. Bell reordered JD's medications and told JD he had to wait for them after the upcoming weekend. (PSOF 80-81).

On the same day (July 19th) FHA Erno responded to Deputy Warden Currier's 7/18/12 email that alerted her to JD's situation. (PSOF 74 and 82). Erno responded: "Merrick 99252 Blood Pressure meds—was seen by provider today and all medications were **renewed**." (Id.) But JD's meds were not provided. So, the next day (July 20th) JD submitted another informal grievance along with a formal EMERGENCY grievance that goes to FHA Erno. (PSOF 83-84). The emergency grievance was scanned to Erno on the same date. (Id.)

On July 24th FHA Erno was contacted by JD's mother again demanding Erno help her son immediately. (PSOF 85). On July 25 the ASPC-Lewis HSCMB's Terry Allred alerted FHA Erno about JD's situation, too. (PSOF 87). On July 26th FHA Erno rejected JD's emergency grievance and sent it back to his unit because the grievance coordinator forgot to sign it and give it a case number. (PSOF 84). The grievance was signed and given a case number and resent. (Id).

On July 26th JD submitted yet another informal grievance because FHA Erno hadn't addressed any of his prior complaints and he was still very

5. Dr. Bell assessed JD with congestive heart failure. (PSOF 80), which is known to be caused by poorly controlled hypertension. (PSOF 510).

26

sick and in need of help. (PSOF 88). On July 26th Terry Aured emailed FHA Erno again, asking for her to provide him with an update on JD's medications. (PSOF 89). Erno's assistant replied false asserting that JD received his heart meds. (PSOF 90).

JD continued pleading for help every day. On August 1st JD's counselor told him that Wexford staff was aware of his situation and they were "working on it." (PSOF 91). On August 3, 2012 JD finally got his medications Propafenone and lisinopril after 24 days without it. (PSOF 92). On August 8, Defendant Erno unapologetically responded to JD's 7/20/12 emergency grievance which was nothing more than just an accounting of when JD received his medications and nothing more. (PSOF 93) Throughout JD's ordeal FHA Erno did not refer JD to a provider or arrange for him to get his missing medications. (PSOF 94). In discovery JD asked Erno if she supervised pharmacy services at ASPC-Lewis, which she was required to do, and she said she did not. (PSOF 95). Erno also did not know if JD's meds could have been provided to him from an onsite stock. (Id.). Of course it wasn't long afterwards while Erno was still the FHA that JD ran out of another one of his heart and BP medications on August 20th, Atenolol. (PSOF 99, et seq).

JD appealed Defendant Erno's grievance response to the ADC Director's Office and on October 16th JD's appeal was granted. (PSOF 107). The Director concluded that Defendant Erno did not follow the emergency grievance procedure, causing a delay in care to JD. (Id.)

Accordingly, Defendant Erno can be found liable for deliberate

27

indifference to JD's medical needs because she "knowingly failed to respond to [his] requests for help." Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006). Under this record JD is entitled to summary judgement. Fed. R. Civ. P. 56(c).

## V.   COUNT TWO

Named as defendants in count two is ADC Director Charles Ryan, the ADC's HSCMB's Director Richard Pratt, Corizon Health, Inc. ("Corizon") and Cameron Lewis the ASPC-Lewis FHA.

Due to the limited time JD has remaining to complete the instant motion he respectively incorporates the following PSOFs for the Court's consideration incorporated herein by reference: PSOFs 1-10, 12-13, 15-16, 20, 23-24, 27, 42, 44-49, 51-52, 62-63, 77-78, 94, 102, 107-**108**, 119-122, **124**, **126-127**, **132**, 134, **136-150**, **151-158**, **159-** 558.

### A.   DEFENDANT CORIZON

Defendant Corizon has employed a number of policies and practices that is the moving force behind the numerous lapses that JD experienced in receiving his life saving medications that resulted in his unnecessary pain and suffering since March 4, 2013.

Corizon is at all times responsible for the provision of inmate healthcare in the ADC as of March 4, 2013. (PSOF 168). Like its predecessor, Corizon chose to provide inmates' their medications vis-a-vis a fax and fill system via PharmaCorr (Corizon's wholly owned subsidiary) that dispenses medications to ADC inmates from a facility in Oklahoma. (PSOF 169-171).

28

PharmaCorr provides inmates enough medication for 30 days (in theory) between refills, called KOPs. (PSOF 173). Corizon does not dispense KOPs on weekends or holidays. (PSOF 172). Because of this practice, he will take several days for JD to receive his medications — longer if his medication is a non-formulary. (PSOF 177-178). Medications are also further delayed by poor weather and road conditions and computer/fax glitches. (PSOF 179). JD's evidence demonstrates that he has fallen victim to these practices on numerous occasions over a two year period because he will run out of his life saving medications before he can get renewals/refills. (E.g. PSOFs 184-205, 208-209, 211, 223-224, 226-227, 229-231, 234-245, 252-255, 262-267, 269, 271-292, 299, 309, 313, 318, 325, 327, 334, 336-339, 341-342, 344-347, 349-350, 352-355, 358-368, 371-374, 376-389, 391-392, 396-404, 406, 409, 420, 439-440, 442, 451, 453-467, 472, 484-488, 491-500, 502-505, 508, 512-539, 545, 549. At the end of the complaint, with regard to Count Two, on June 23, 2015, Defendant Pratt (Director of the ADC's HSCMB) responded to JD's fourth grievance appeal:

"Review of your medical records show that since 3/9/15 there have been CONTINUED missed doses for a number of your medications." (PSOF 549)

This way of doing business is not new to Corizon's contract with the ADC, it's how they do business around the country too. (PSOF 180). Defendant Corizon operates this way despite knowledge that "failure to take ordered medications can have a negative effect on the immediate or long-term health

6. Corizon officials: "PharmaCorr has been sloppy lately on refilling medications" — with regard to JD and others.

7. See PSOF 516, 519, 523, 526, 529, 533, 539, 545.

29

AND WELL BEING OF THE PATIENT." (PSOF 147).

JD's EVIDENCE PROVES: A) CORIZON MADE NO ATTEMPTS TO CORRECT THE deficiencies RESPONSIBLE FOR INTERRUPTIONS IN JD's MEDICATIONS SPANNING OVER 2 YEARS. B) Corizon's own documents INDICATE harm may BEFALL PATIENTS who do NOT TAKE their medications AS PRESCRIBED. And; C) THE NUMEROUS INTERRUPTIONS IN JD's MEDS EXACERBATED his CARDIAC AND hypertension CONDITIONS. TAKEN TOGETHER THESE FACTORS ESTABLISH THAT CORIZON IS LIABLE AND GUILTY OF VIOLATING JD's Eighth Amendment PROSCRIPTION OF CRUEL AND UNUSUAL PUNISHMENT AND thus SUMMARY JUDGEMENT IN FAVOR OF JD IS APPROPRIATE. Gibson v. County of Washoe, 290 F.3d 1175, 1191 (9th Cir. 2002)(holding that summary judgement is appropriate if a Jury could Infer that policymakers knew that their policies would pose a risk of substantial injury).

In addition to the aforementioned, JD also presents evidence to establish that Corizon failed to supervise and train their employees. JD also proffers evidence that Corizon employed unqualified FHA (DEFENDANT Lewis). THE LATTER will be discussed UNDER SECTION B (FHA Lewis) infra. JD ARGUES THAT THESE shortcomings ALSO ATTRIBUTED TO THE LAPSES IN JD's MEDS.

For INSTANCE, ON multiple OCCASIONS JD submitted HNRs REQUESTING RENEWALS AND OR REFILLS of his medications SEVERAL days ahead OF THE EXPIRATION, but VARIOUS Corizon EMPLOYEES RESPONSIBLE FOR PROCESSING the HNRs SAT ON THEM FOR days BEFORE ACTING. (PSOF 225-226, 230, 234, 238, 252-253, 289, 313, 318, 367, 389, 396, 401-402, 409, 442, 451, 491, 497, 500, AND 516).

In short, JD's RECORD ESTABLISHES that he is ENTITLED to SUMMARY Judgement. Marcotte v. Monroe Corrections Complex, 394 F.Supp 2d 1289, 1297 (W.D.

WASH. 2005) (Officials who are aware of deficient procedures yet fail to take corrective action are liable). Alsina-Ortiz v. LaBoy, 400 F.3d 77, 81-82 (1st. Cir. 2005).

## B.   DEFENDAND FHA C. LEWIS

Defendant Cameron Lewis was the Corizon FHA at the ASPC-Lewis from March 4th to October 2013. (PSOF 160). He was responsible for "ensuring that ADC prisoners receive their medically necessary medications vis-a-vis Defendant Corizon's pharmacy division located in Oklahoma in a manner that guaranteed continuity of care." (Id.) FHA Lewis "must properly supervise and train those employees whos job it is to communicate medication orders and refills to the pharmacy, if necessary troubleshoot, and make sure prisoners receive their medications." (Id.) The FHA shall ensure arrangements are made for treatment or delivery of medications immediately after being notified of such a need by the supervising physician or Director of Nursing. (Id.). The FHA is also responsible for investigating and responding to inmate medical grievances within their prescribed timeframes: Immediately if its an emergency, and fifteen (15) days if its a non-emergency. (PSOF 161-162).

The FHA functions as liaison between the contractor, correctional officials and public agencies, and implements and monitors all contractually required services. (PSOF 163). Defendant Lewis also had the authority to have JD evaluated by a medical provider. (PSOF 165).

Pursuant to Defendant Corizon's hiring standards Defendant Lewis was required to have a Bachelors degree in health care administration/related field or be a licensed Registered nurse, a nurse practioner, or a physi-

31

CIANS ASSISTANT. (PSOF 166). Defendant Lewis had none of these qualifications. (PSOF 167). His lack of qualifications contributed to JD's lapses in his medications and blood pressure issues discussed infra.

Given the limited amount of time JD has remaining he respectively incorporates the following PSOFs herein by reference concerning Defendant Lewis: 184 - 410.

The first contact JD had with FHA Lewis under the ADC contract with Corizon was on March 10th, 2013. (PSOF 196). JD sent Lewis an HNR describing the medical crisis he experienced the day before after he ran out of his heart and BP medications (Id.). JD's HNR alerted Defendant Lewis to: A) JD's serious health issues. B) JD's need for his medications and what happens to him if he doesn't have his medications, even after just 24 hours. And; C) The prison Corizon staff did nothing to help JD despite critically high BP and related symptoms and that Corizon did not provide JD with medication before sending him back to his unit. (Id.). Two (2) months later Defendant Lewis finally responded with false information asserting that JD was "responsible for ordering [his] own medications[8]." (PSOF 238). As for the other issues JD raised in his HNR FHA Lewis ignored them.

JD's mother also called and spoke to Defendant Lewis on March 10th alerting him to JD's illnesses and crisis without his medications. (PSOF 197). JD received no help, so he sent another HNR to Lewis after trying but failing to get help from his unit Corizon staff. (PSOF 198). JD told Lewis he now resorted to taking medications

8. ADC inmates are NOT responsible for "ordering" their own medications. (PSOF 379).

32

belonging to other inmates. (Id.). JD pleaded for Lewis' help and in large letters he wrote "EMERGENCY" atop of his HNR. (Id.). Lewis did not respond. On this same date JD also submitted an "EMERGENCY" medical grievance, which the FHA is required to "immediately" address. (PSOF 202-203). Defendant Lewis of course would not address the grievance, ever. (PSOF 204). Perhaps if Lewis did have the medical qualifications Corizon set for their FHAs Defendant Lewis may have taken JD's situation much more serious. (E.g. pp. 31-32 supra). Then again, maybe not. Lewis also determined that one of JD's grievances wasn't an emergency - a medical decision.

JD did finally receive his meds after going without them for 5 days on March 12, 2012. (PSOF 205). But this was just the beginning of JD's nightmare. The aforementioned is just the start of an ongoing monthly pattern of repeated lapses and deliberate indifferent responses and ommisions by FHA Lewis. Over the next several months numerous people would advocate for JD by calling and emailing FHA Lewis and Defendants Ryan, Pratt, and Corizon — including the Arizona governor and Senator Pancrazi. (PSOF, 293, 347-351). In response to inquiries on behalf of JD his advocates were told by FHA Lewis and others that JD had his medications when he did not and that JD was to blame for any lapses. (E.g., PSOFs 214, 225, 239-245, 250, 259, 270-272, 279-280, 283, 307, 317, et seq). Defendant Lewis was callous and flippant with regard to JD's situation. In one email he told JD's friend Sannah Kronenberg: "Inmate Merrick is not going to die in the near future... Mr. Merrick is an adult and must take some part in his day-to-day health care." (PSOF 283). Meanwhile behind the scenes officials are critizing FHA Lewis for his poor job performance involving JD's health care issues (PSOF 215-216, 305-306, 343, 349, 378-379).

While JD was seriously sick all the time due to repeated lapses in his medications Defendant Lewis was complaining to his colleagues about how

he was being "hounded" by people calling or emailing him about JD needing help. (PSOF 270, **317**). Lewis even received emails from JD's deputy warden (K. Currier) on May 28, 2013 about JD. Currier wrote, in part: "I am standing in front of him (JD) right now... He sounds winded, looks pale and is telling me he's out of his meds and has been for a week. He says they are for arrhythmia & hypertension. (Diltiazem, Propafenone, Lisinopril, & Hydrochlorothiazide)." (PSOF 271). That same day Lewis emailed JD's friend Ms Kronenberg: "...his medications are current. It is the inmates responsibility to insure his medications are refilled and up to date." (PSOF 272). Two weeks earlier on May 10th Defendant Lewis complained to ADC health officials: "...As I stated before Mr. Merrick is a high profile - frequent flyer of HNRs and Requests." (PSOF 243). On June 27th, 2012, he wrote: "...The man is afraid of dying. Every pain, crack or snap he runs to medical." (PSOF 322) According to Defendant Lewis, JD was an annoyance and he didn't care about JD's interruptions in his medications that made him sicker.

        This is a disgusting case of blatant deliberate indifference that not only warrants granting JD summary judgement but arises to a case where punitive damages are also appropriate. There is neither time or space herein to go through every instance but JD prays that the Court will examine his statement of facts as cited throughout this section involving Defendant Lewis for a complete picture of the unnecessary suffering that JD had to endure because Lewis. Jett, 439 F.3d at 1098 (As prison administrator [FHA] is liable for deliberate indifference when they knowingly fail to respond to an inmates request for help).

9. It is NOT the inmates responsibility. (See PSOF 379). As for his meds being current it doesn't mean he received them. (Cp. PSOF 286).

## C. DEFENDANTS CHARLES RYAN AND RICHARD PRATT

Between September 29, 2012 and March 25th, 2014, Defendant Pratt went from being the HSCMB Director to being the Program Evaluation Administrator (PEA) in the HSCMB. (PSOF 159). The duties of the PEA is to ensure that Corizon provides appropriate, timely, and professional medical, mental health and dental services to the inmate population. (Id.) The PEA **resolves** and/or reports quality/clinical care issues, makes recommendations for monetary sanctions, and initiates cure notices. (Id.). Pratt shares the responsibility with FHAs "for ensuring that ADC prisoners receive their medically necessary medications vis-a-vis Defendant Corizon's pharmacy division located in Oklahoma, in a manner that guarantees continuity of care". (Id.) They must PROPERLY SUPERVISE and TRAIN those employees whose job it is to communicate medication orders and refills to the pharmacy, if necessary troubleshoot and make sure prisoners receive their medications. (Id.).

In contracting with Corizon the ADC gave Corizon "the flexability to provide pharmacy operations off-site or to retain existing physical space on prison grounds." (PSOF 169). Like its predessor, Corizon chose a fax and fill system by way of their pharmacy in Oklahoma. (PSOF 170-171) The ADC and Corizon agreed not to dispense medications to ADC prisoners on weekends or holidays. (PSOF 172). Prisoners are provided KOP medications for self administration in 30 day blistard card supplies. (PSOF 173). Inmates may not possess more than a 30 day supply of medications. (PSOF 175). Non-formulary medications require additional authorization which takes longer to process and reach the inmate. (PSOF 177). Because Corizon relies on its pharmacy operations in Oklahoma it can take several days for the medication to reach the inmate. (PSOF 178).

Consider the following, which is but just one of numerous incidents involving JD...

On July 15, 2013, Defendant FHA Lewis responded to JD's medical grievance dated 6/28/13 marked "EMERGENCY" in case no. 125-052-013 concerning on-going interruptions in JD's medications. Lewis, in part, wrote: "The 06/27/2013 date when the prescription was submitted was a Thursday. Our pharmacy is in another state and they do not deliver medications on weekends."

This is a practice that is mostly responsible for the lapses in JD's meds, from the beginning (March 2013 / PSOF 201) all the way through to the present in 2015 (PSOF 539, 545). On the below dates Defendants Ryan and Pratt were either made aware of, or they were engaged in communications, concerning JD's medication issues and his declining health that was exacerbated by interruptions in his medications. These contacts and communications are not exhaustive and they include but are not limited to: phone calls, emails, letters, grievances and grievance responses. In every instance Ryan and Pratt were asked to help JD and to fix the problems that were responsible for the lapses in JD's medications:

| DIRECTOR C. RYAN | ASST. DIRECTOR R. PRATT |
|---|---|
| March 10, 2013 (PSOF 197) | March 10, 2013 (PSOF 197) |
| April 10, 2013 (PSOF 229) | May 10, 2013 (PSOF 239) |
| May 10, 2013 (PSOF 239) | May 15, 2013 (PSOF 245, 248-250) |
| June 5, 2013 (PSOF 279) | May 20, 2013 (PSOF 259) |
| June 11-12, 2013 (PSOF 292-304) | June 5, 2013 (PSOF 279) |
| June 19, 2013 (PSOF 315) | June 11, 2013 (PSOF 292-300) |
| July 1, 2013 (PSOF 340) | July 1, 2013 (PSOF 340) |

36

| RYAN (CONT.) | PRATT (CONT.) |
|---|---|
| July 3, 2013 (PSOF 344) | July 15, 2013 (PSOF 359) |
| July 8, 2013 (PSOF 346-348, 351) | Jun 29, 2013, (PSOF 356)/Lawsuit Filed |
| July 12, 2013 (PSOF 356) | August 19, 2013 (PSOF 392) |
| July 29, 2013 (PSOF 375)/Lawsuit Filed | November 25, 2013 (PSOF 424) |
| August 19, 2013 (PSOF 392) | March 5-8, 2015 (PSOF 526-537) |
|  | June 23, 2015 (PSOF 549) |

In every single instance both Defendants shrugged off the statutory obliga-tion to make sure that Defendants Corizon and Lewis provided JD's medications without further delays. (Id.). Defendant Ryan merely forwarded emails sent to him about JD to Corizon officials. At one point even he had to conclude Corizon wasn't doing any-thing about it and he (Ryan) needed to take additional steps to ensure that the problem was fixed, but he never does. The same goes for Defendant Pratt. At one point JD sent Pratt a letter on July 15, 2013 and begged Pratt for help, otherwise JD warned Pratt that he would have to file a lawsuit. (PSOF 359). As he had told JD numerous times before Pratt told JD again in response to his plea for help: "All of these issues you have raised are under the responsibility and treatment plans from Corizon." (Id.) Ryan and Pratt think they're free and clear of any and all liability because they forwarded JD's complaints to Corizon. Thats not how it works, and they know it. The Parsons' Court warned them about this in November 2012. (PSOF 16). Just because they pay a vendor for the provision of health care doesn't mean they're no longer responsible to ensure the care they get is constitutional. In fact the contract between the ADC and vendors even states that the ADC's obligation is ongoing. "In case of default (the Contractor fails to perform its responsibility under the terms of the contract), the ADC reserves the right to procure services or to com-

plete the required work in accordance with the Arizona Procurement Code." (PSOF 15). Of course, they can also impose monetary sanctions against the vendor for even a single act of deliberate indifference. (PSOF 14). Yet, at no time during the timeframes set out in counts 1-2 did the ADC or its agents take any corrective action (i.e., fines) against the contractors in JD's case. (PSOF 557).

Defendant Pratt testified that he did not have the authority to make the vendors compliant, that he will "only" monitor the contractor and "rely" on them to "hopefully" deliver inmates' medications on time. (PSOF 20). This is his defense. It is Ryan's defense as well. (PSOF 181). Ryan, who by the way is generally familiar with the contract terms and conditions, has gone a step further and stated that the ADC will not require health services vendors to deliver medications on weekends and holidays or require that prisoners medications be dispensed from pharmacies within Arizona. (PSOF 182-183).

JD's record demonstrates that he is entitled to summary judgement and that Defendants' Ryan and Pratt are deliberately indifferent to JD's serious medical needs in violation of the Eighth Amendment. Alexander v. Perrill, 916 F.2d 1392, 1395 (9th Cir 1990) (Prison Officials "cant just sit on [their] duff and not do anything to prevent violations of rights). Lewis v. Mitchell, 416 F.Supp.2d 935, 945 (S.D. Cal. 2005) (A person is liable under 1983 if he "omits to perform an act which he is legally required to do that causes the deprivation of which the Plaintiff complains.")

VI.    COUNT THREE

Named as defendants in count three are Dr. Patrick Arnold and RN Becky Briddle

38

A.   DEFENDANT DR. ARNOLD

At all times relevant to count 3 Dr. Arnold is the Associate Regional Medical Director for Corizon under the ADC contract. (PSOF 412). Dr. Arnold's duties include reviewing consult requests or off-site referrals to determine medical necessity. (PSOF 413). Dr. Arnold's options were to approve or to recommend an alternative treatment plan. (Id.).

Pursuant to Corizon policy the timeframe for handling an outpatient "URGENT" referral is "1 business day" (PSOF 414). The appointment is to be carried out within fifteen (15) days, and no longer. (PSOF 415).

In the months and weeks leading up to October 15th, 2013, JD had submitted HNRs dated August 21, September 25, and October 12, 2013 complaining about bp problems and cardiac symptoms resulting in chest pains, dizziness and loss of consciousness that he perceived was getting worse. (PSOF 393-394, 397, 405, 407, and 410). On October 15, 2013, JD was evaluated by Dr. Kenneth Merchant who determined that JD needed to see a cardiologist urgently and therefore Dr. Merchant submitted the "URGENT" cardiology consult request to Defendant Dr. Arnold who received the urgent request on October 21, 2013. (PSOF 411, 416). Upon receipt of Dr. Merchant's urgent request, Dr. Arnold's office sent an email to the Corizon clinical coordinator at ASPC-Lewis (Aaron East) and told him to "please resubmit with previous cardiology note from June/July[10] along with request form." (PSOF 416).

---

10. The last time JD saw the cardiologist was on 6/27/13. (PSOF 323) It is standard for JD to follow up with cardiology every 6 months to check his pacemaker function. His next visit was due in December, 2013.

Over the next 6-8 weeks JD had yet to see cardiology and everyday was a struggle. (PSOF 421). JD's BP continued to fluctuate and his arrhythmias were not getting any better. (Id.). JD was SOB, lightheaded, dizzy, lethargic, and even confused. (Id.). About 3-4 days a week JD lost consciousness that lasted a few seconds to longer than a minute. (Id.). He fell. (Id.) He was to remain in bed most of the time. (Id.). He needed help from fellow inmates to get out of bed and use the restroom. (Id.). JD couldn't shower or sleep, his meals had to be brought to him. (Id.). Regularly JD reported his symptoms to his unit nurses and they told him he had to just wait to see the cardiologist. (Id.). JD prayed he would die. (Id.)

On November 23, 2013, JD submitted an HNR to Clinical Coordinator Aaron East inquiring about the status of his 10/15/13 urgent cardiology consult. (PSOF 423). JD told East he desparately needed to see the cardiologist expiditiously. (Id.). JD told East he was having "A LOT" of symptomatic arrhythmia (i.e., chest pain, SOB, insomnia, syncope, etc.). (Id.).

On November 25, 2013, JD's mother sent an email to Corizon and to Defendant Pratt pleading with them to get her son to a cardiologist as soon as possible. (PSOF 424). It would later be determined that the November and December 2013 urgent consults were not in compliance with regard to the length of time they were taking to get done. (PSOF 425). On November 26, 2013, JD submitted an HNR to Corizon informing them that he lost consciousness again and he had a lump on his head where he fell and hit it. (PSOF 426). JD again pleaded to see cardiology. (Id.). The next day JD lost consciousness again. (PSOF 427). He received NO help! (Id.).

On December 3, 2013, Defendant Dr. Arnold authorized JD's cardiology consult as a "routine" follow up instead of "urgent" despite JD's suffering. (PSOF 441). On December 4, 2013, JD submitted an EMERGENCY grievance which in part pleaded to see a cardiologist immediately. (PSOF 439). On December 11, 2013, Conzon refused to process JD's grievance as an emergency. (PSOF 443) JD appealed on this same date. On December 16, 2013, JD received an undated and unsigned correspondence bearing the grievance number that simply stated "you are currently scheduled to see cardiology." (PSOF 445).

On December 18, 2013, sixty-four (64) days after Dr. Merchant submitted the urgent consult JD saw his cardiologist who quickly reprogrammed JD's pacemaker and made changes to his pacemaker. (PSOF 446). When JD returned to the prison that day his BP was low at 88/62 and he was tachycardic at 156 BPM. (PSOF 447). With the cardiologist's help JD's vitals would normalize until he encountered more interruptions of his meds 11 days later. (PSOF 454).

JD's evidence demonstrates that Defendant Dr. Arnold did not process JD's cardiology consult as an URGENT despite Dr. Merchant's assessment of JD on 10/15/13 when he submitted the request. JD suffered unnecessarily in violation of his Eighth Amendment Rights. JD is entitled to summary judgement. See, Brown v. District of Columbia, 514 F.3d 1279, 1284 (2008) (Delaying an urgent medical transfer for 60 days amidst prisoners pleas for help is actionable)

## B. DEFENDANT RN BRIDDLE

Defendant Briddle is a registered nurse (RN) at all times herein at the Barchey Unit where JD was housed. (PSOF 429). She was ordered by JD's providers to

monitor JD's BP during the months of November and December 2013 pending JD's cardiology appointment. (PSOF 422). Given the severity of his problems JD asked that his BP be checked daily but Briddle would not allow it; she approved to check JD's BP twice a week — but she wouldn't even do that. (Id.)

On November 26, 2013, JD submitted an HNR explaining that he lost consciousness and hit his head due to persistent low BP problems. (PSOF 426) RN Briddle waited until 12/4/13 to respond back with "3 scheduled!" (Id.). On November 29, 2013, JD lost consciousness again and had to be helped to the ACI medical office where Defendant Briddle was summoned to help JD. (PSOF 427). RN Briddle saw JD on the ground and refused to render him attention and sent him away in violation of protocols for chest pain complaints and syncope. (Id.) Also cf. (PSOF 430-432). At all times herein RN Briddle was aware of JD's serious health issues involving his heart and BP, and she's aware of the risks of harm associated with serious symptoms that JD exhibited, (PSOF 433-434). When pressed for a reason by officials why she turned JD away she said that she was "too busy" to help him — she was holding provider's line inside medical, and she didn't want him inside. (PSOF 427 and 436), JD remained symptomatic for another 3 weeks until he saw the cardiologist, while Briddle ignored him. (PSOF 435, 450)

Defendant Briddle's actions amounted to deliberate indifference to JD's serious medical condition in violation of the Eighth Amendment. Jett, 439 F.3d at 1096. McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1991).

**VII     COUNT FOUR**

Named as Defendants in count four is Corizon and FHA Lewis. JD literally has minutes remaining before he has to copy his motion and SOF's with exhibits if he is to meet the Court's 12/21/15 filing deadline. JD is heavily medicated (to include Morphine) and experiencing mind altering symptoms related to his underlying health issues. JD is doubtful he can fully brief this remaining count in the little time remaining. JD prays this Court will construe his motion liberally under these circumstances.     For the sake of time JD asks the Court to consider the following PSOF's incorporated herein by reference: 4, 46, 51, 131, 137-141, 147-158, 160-168, 185-187, 189, 207, 210, 213, 217-218, 228, 246, 257, 261, 279, 283, 292, 299, 307-308, 311, 314, 317, 319-322, 326, 329-332, 338, 346, 356-357, 359a-359b, 361, 369, 375-376, 386, 393-395, 407-408, 410-411, 421-423, 426-428, 431, 438, 446-449, 450, 452, 475, 550-551, and 556 .

It is uncontroverted that JD has been treated for extreme hyper and hypotension since circa 2010. (PSOF 4). Over the past few years JD's cardiologists have insisted that JD monitor his BP every day so he knows when to take his medications and avoid fluctuations in his BP. (E.g. PSOF 46, 51, 257, 446). As Defendant Corizon is fully aware of untreated/unmonitored BP is potentially deadly. (PSOF 151-158). In fact, JD has submitted and/or communicated problems with his BP directly or via third parties to Defendants Corizon and FHA Lewis since the start of the Corizon contract in March 2013 — problems ranging from vision complications, arrhythmias, and loss of consciousness, (PSOF 185-187, 207, 210, 213, 217-218, 228, 246, et seq supra). In response to JD's pleas to monitor his BP Defendant Lewis and others tell JD if he wants to check his BP he has to submit HNRs — even though he wouldnt get it checked as

43

ordered by his doctors. (PSOF 283, 307-308). Corizon said no to daily BP checks because they did not operate "walk-in clinics". (PSOF 326). Lewis fired back in an email dated 6/27/13 that JD "isn't fragil". (Id.)

Corizon has a policy that permits inmates to have BP checks only 3 times a week. (PSOF 556). Apart from this staff refuse to monitor JD's BP as ordered because of alleged short-staffing that doesn't allow time for it. (E.g. PSOF 427, 435-436). Even if JD submitted HNRs for BP checks, which he did, it took several days and weeks to have it done — if at all. (PSOF 217, 426).

In short, the real reason for Defendant Lewis not to ensure JD's BP is closely monitored is because he didn't like JD. Lewis made it personal. He commented in a email to a colleague on 6/27/13 regarding the daily BP checks: "...The man (JD) is afraid of dying. Every pain, crack or snap he runs to medical." (PSOF 322).

Eventually, on March 26, 2015 JD was admitted to the IPC in unstable condition due to cardiac and BP issues. (PSOF 548). In the IPC JD is monitored daily and for the first time he is stable (PSOF 550). The only reason he was admitted to the IPC is because Corizon relented under the pressure of JD's March 2015 TRO. (Dkt.    ). What this tells the Court is that JD could have been admitted to the IPC 2 years earlier and JD's suffering would have been avoided!

In conclusion, JD's record demonstrates he is entitled to summary judgement pursuant to Jett v. Penner, 439 F.3d at 1097-98.

44

In conclusion, JD asks that the Courts grant JD's motion and enter summary Judgement in his favor against the defendants.

Respectfully Submitted, this 16th day of December, 2015.

Plaintiff, JD Merrick   (pro se)

Filed pursuant to Court Order dated August 24, 2015, at dkt. 255.

45